DICKINSON, Presiding Justice, for the Court:
¶ 1. At the outset, we wish to state that this case is not about whether the governor is above the law. He clearly is not, and any implication in the dissents, or elsewhere, that he is — or that a majority of this Court believes he is — is incorrect. This case is about whether this Supreme Court has the right, authority, and power to declare itself superior to, and above, both the other two branches of government in all matters of constitutional compliance. While this Court clearly has the constitutional duty to interpret the content of laws passed by the Legislature and executive orders issued by the governor, we decline — as have so many other courts before us — to assume for ourselves the absolute power to police the other branches of government in fulfilling their constitutional duties to produce laws and executive orders, unless there is alleged a justiciable violation of a personal right.
¶ 2. Attorney General Jim Hood asks the judicial branch of government to void several pardons, alleging the applicants failed to publish notice as required by Section 124 of the Mississippi Constitution, which states:
In all criminal and penal cases, excepting those of treason and impeachment, the governor shall have power to grant reprieves and pardons, to remit fines, and in cases of forfeiture, to stay the collection until the end of the next session of the legislature, and by and with the consent of the senate to remit forfeitures. In cases of treason he shall have power to grant reprieves, and by and with consent of the senate, but may respite the sentence until the end of the next session of the legislature; but no pardon shall be granted before conviction; and in cases of felony, after conviction no pardon shall be granted until the applicant therefor shall have published for thirty days, in some newspaper in the county where the crime was committed, and in case there be no newspaper published in said county, then in an adjoining county, his petition for pardon, setting forth therein the reasons why such pardon should be granted.[1]
After we received this appeal, Governor Barbour — who issued the pardons — submitted an amicus curiae brief, and we allowed his counsel to participate in oral argument. At oral argument, we asked Attorney General Hood to point out any pardon that was not facially valid, and he could not.
¶ 3. The parties and Governor Barbour have presented numerous issues for our consideration, including: whether those who did not apply for a pardon were required to publish notice; whether the governor — and not the convicted felons — applied for some of the pardons; whether some of the pardons had any applicant at all; whether the publication provision requires four or five weekly publications; whether the governor, the attorney general, or the pardonees have the burden of *403 proof; and whether the attorney general is estopped from objecting to the pardons.
¶ 4. The contrasting views on these and other issues were forcefully and passionately argued in an array of briefs, dissents, and in an extended oral argument. But we need not discuss these issues because, even assuming the attorney general’s views are correct, the controlling issue is not whether Section 12⅛ requires applicants for pardons to publish notice — it clearly does. The controlling issue is whether the judicial branch of government has constitutional authority to void a facially-valid pardon issued by the coequal executive branch, where the only challenge is compliance with Section 121fs publication requirement.
¶ 5. No judicial duty is more central to the proper operation of our system of government than is our duty to decide this issue correctly. In carrying out this duty, as we must, and respecting the clear constitutional provisions that separate our powers from the governor’s powers, we are compelled to hold that — in each of the cases before us — it fell to the governor alone to decide whether the Constitution’s publication requirement was met.
BACKGROUND FACTS AND PROCEEDINGS
¶ 6. During his last days in office, Governor Haley Barbour granted executive clemency to 215 persons, most of whom were no longer in custody. Of the twenty-six persons in custody, Governor Barbour granted ten full pardons; thirteen medical releases; one suspension of sentence; one conditional, indefinite suspension of sentence; and one conditional clemency.
¶ 7. Attorney General Jim Hood filed a civil action in the Circuit Court of the First Judicial District of Hinds County, alleging he had “reason to believe that former Governor Barbour’s attempted pardons ... were in violation of Section 124 of the Mississippi Constitution.” Section 124 requires an applicant for a pardon to publish a petition stating why the pardon should be granted.
¶ 8. The attorney general initially named five defendants, but then requested the circuit judge to declare all pardons it found to be in violation of Section 124 null, void, and unenforceable. The circuit judge issued a temporary restraining order (TRO), requiring every person granted a pardon by Governor Barbour to provide the court “sufficient proof [of publication] consistent with Section 124 of the Mississippi Constitution. ...” The TRO also prohibited the Mississippi Department of Corrections’ releasing any person pardoned by Governor Barbour, until the Department had provided the court sufficient proof of acceptable Section 124 publication.
¶ 9. The circuit judge extended the TRO and ordered the defendants to appear at a preliminary injunction hearing. The appellants petitioned this Court for permission to file an interlocutory appeal. We granted the appellants’ petitions, stayed all proceedings in the circuit court, and ordered that the trial court’s extended TRO remain in effect until further order of this Court.
ANALYSIS
¶ 10. Governments are operated by people. And no government has ever existed without disputes among those in positions of power. Some disputes — perhaps most — are settled by compromise. But when a compromise cannot be reached, ultimate authority must rest somewhere to settle the disputed question. In some nations, that final authority rests with a king. For others, such decisions are made by a military leader. But by deliberate design, our system of government is different.
*404 ¶ 11. Our Constitution divides governmental power among three branches, or departments, of government. And so important did the drafters regard the separation of those powers that they addressed it in the first two sections of our 1890 Constitution: /
ARTICLE 1, SECTION 1.
The powers of the government of the state of Mississippi shall be divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another.[2]
ARTICLE 1, SECTION 2.
No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others. The acceptance of an office in either of said departments shall, of itself, and at once, vacate any and all offices held by the person so accepting in either of the other departments.[3]
¶ 12. Our state government was modeled after the federal system. And for fifteen years after the people ratified the Federal Constitution, the three branches of the federal government struggled with issues regarding them respective powers. Then, in 1808, the United States Supreme Court reviewed a case and rendered a landmark decision that directly addressed the separation of powers.
Marbury v. Madison[4]
¶ 13. As John Adams’s presidency came to a close, and his Federalist Party began losing power, Thomas Jefferson — who, as a member of the “Republican-Democrat” party, opposed consolidation of power in the federal government — was due to succeed President Adams in March 1801. Adams’s lame-duck Federalists — desperate to preserve power — passed the Organic Act and the Judiciary Act, which allowed Adams to appoint forty-two justices of the peace and sixteen new circuit-court justices for the District of Columbia. After Adams signed the commissions of these new judges (known today as the “midnight judges”), his Secretary of State, John Marshall (who, interestingly, was later to author Marbury v. Madison), sealed them.
¶ 14. But when President Jefferson took office, he refused to honor the commissions because they were not delivered until after President Adams’s term had expired. William Marbury, who was due a commission, applied for a writ of mandamus[5] asking the Supreme Court of the United States to compel President Jefferson’s Secretary of State, James Madison, to deliver the commissions.
1115. The Supreme Court held the commissions were valid and binding when signed by President Adams, but refused to grant Marbury’s request for a writ of mandamus because the matter was outside the Court’s original jurisdiction.[6] While the Court’s disposition of Marbury’s commissions issue is of little importance today, its disposition of the jurisdictional issue and *405 its comments on the separation of powers are of central importance.
¶ 16. The jurisdictional issue arose from a claim that, when Congress passed the Judiciary Act, it overstepped its bounds by granting the Supreme Court jurisdiction to issue writs of mandamus. The Court held that the Constitution, not the Congress, established its jurisdiction. So after declaring that Marbury’s commission was indeed valid when signed by President Adams, the Court nevertheless refused to issue a writ of mandamus — and Marbury did not get his commission.
¶ 17. In reviewing judicial versus executive power, the Court held that it falls to the judiciary to decide the constitutionality of Congressional acts. But it also recognized that conflicts would arise among the constitutionally established branches of government regarding the separation of powers, and the Court recognized the judiciary’s potential abuse of that power.
¶ 18. Despite the Marbury Court’s declaration of its “emphatic” duty to interpret the Constitution, Chief Justice Marshall cautioned:
The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.[7]
Under this doctrine, the United States Supreme Court — as well as this Court — has refused to exercise jurisdiction over a matter when there was a “textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it....”[8] This principle has carried forward.

Nixon v. U.S.

¶ 19. For example, in Nixon v. U.S.,[9] when a former district-court judge who had been convicted of perjury refused to resign,[10] the House of Representatives presented three articles of impeachment to the Senate.[11] Under Senate Rule XI, a committee of senators held hearings to receive evidence and take testimony.[12] The transcripts of those hearings, as well as a summary of the evidence and facts, were presented to the full Senate for a vote.[13] After briefing and argument, the Senate convicted the judge.[14]
¶ 20. The judge filed suit, arguing that Senate Rule XI violated Article I, Section 3, Clause 6, of the U.S. Constitution, which reads: “The Senate shall have the sole power to try all Impeachments.”[15] The judge argued that the Senate was not above the Constitution, and the Constitution guaranteed him a trial before the Senate, not a hearing before a committee.[16]
¶ 21. The Supreme Court refused to rule on the issue, holding that to do so *406 would be mandating and regulating a procedure specifically committed to the Senate — not the Court. Further, the Senate must function independently and without interference from another branch in order to maintain the constitutional separation of powers.[17] Any attempt by the Court to adjudicate the Senate’s impeachment procedure “would introduce the same risk of bias as would participation in the trial itself.”[18]
¶ 22. The Nixon Court also noted that the Framers specifically — and textually— committed the impeachment power and its procedure to the Legislature as a check on the powers of the judiciary.[19] Therefore, according to the Court:
Judicial involvement in impeachment proceedings, even if only for purposes of judicial review, is counterintuitive because it would eviscerate the important constitutional check placed on the Judiciary by the Framers. Nixon’s argument would place final reviewing authority with respect to impeachments in the hands of the same body that the impeachment process is meant to regulate.[20]
¶ 23. The Court concluded that, while the judiciary does possess the power to review legislative or executive action exceeding constitutional limits, the Court cannot review or interpret a constitutional procedure that has been textually committed to another branch.[21]
¶ 24. The Nixon Court found the constitutional system of checks and balances essential to preserving the separation of powers. As stated by James Madison in Federalist Number 48:
The powers properly belonging to one of the departments ought not to be directly and completely administered by either of the departments.... It will not be denied, that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it.... [T]he next and most difficult task is to provide some practical security for each, against the invasion of the others.[22]
¶ 25. So, according to Marbury and its progeny, cases and controversies involving interpretation and adjudication of constitutional provisions that are textually committed to another branch of government are nonjusticiable.
¶ 26. Here, we must examine our precedent regarding the separation of powers and the justiciability of such issues before the courts of Mississippi.
¶ 27. More than once — and dating back to cases decided under previous versions of our Constitution — this Court has determined that compliance with constitutional provisions that are procedural in nature and committed solely to another branch of government is not justiciable.

Ex Parte W.V. Wren

¶ 28. Because many of the attorney general’s (and the dissents’) arguments in this case closely parallel the arguments *407 presented in Ex Parte W.V. Wrenf[23] and because the Wren Court rejected those arguments for most of the same reasons we reject the Attorney General’s today, we provide an extended analysis.

Background of the case

¶ 29. In 1886 the Mississippi Secretary of State enrolled a law that placed a privilege tax “on each person traveling and selling goods or merchandise by sample or otherwise in this State.”[24] The bill had been “signed by the speaker of the house of representatives, the president of the senate, and the governor.”[25] On its face, the bill appeared to be a valid and duly enacted law.
¶ 30. But when W.V. Wren was arrested in Jackson for selling goods without paying the tax required under the statute, he obtained a writ of habeas corpus, alleging that the statute was unconstitutional and unenforceable because the bill presented to the governor for signature was not the bill passed by the Senate and House of Representatives. Wren argued that, if the court would simply look at the legislative journals, it would see that “amendment 34” — an amendment whose language would have exempted him from the tax — was added by the Senate and accepted by the House of Representatives.[26] He further argued that a basic prerequisite (or condition precedent) to the validity of a law is that the law be the one actually passed by the houses of the Legislature.

Wren’s brief

¶ 31. Making an argument strikingly similar to the concerns raised by Justice Randolph in dissent, Wren’s brief to this Court — written more than 120 years ago— stated:
If the court can only look at the face of the bill as enrolled, then the limitations in the constitution are void and of no effect, and the powers pretended to be thereby conferred upon the judiciary are of no avail, for the legislature promulges the act, and there exists no power to question it. It makes the legislature the judge whether the provisions of the constitution have been infringed. It violates the provisions of that instrument by allowing the legislative branch to exercise judicial functions.[27]
¶ 32. Simply stated, Wren argued that courts must look behind the face of a statute and review the issue of whether the constitutional prerequisites were met when the law allegedly was passed. Any refusal to do so, he argued, would render the constitutional limitations on the Legislature “void and of no effect,”[28] and would eviscerate the concept of judicial review of constitutional questions. Wren’s argument is a direct parallel to Attorney General Hood’s argument that:
the governor [the Legislature] cannot exercise the pardon power [the power to enact legislation] (or any other power) in derogation of the Constitution. The Constitution sets several limits on the manner in which the pardon power can be exercised [legislation may be enacted]. And those limits — and whether the Governor [the Legislature] acted within them — are precisely what the courts can, and, in this case must, review.[29]
*408 ¶ 33. Wren further argued that “there must be evidence of some character, outside of the face of the enrolled bill, by which the judge can determine whether the act has been passed in the mode and within the limits prescribed by the constitution.” [30] He continued:
The judiciary, to determine whether an alleged statute is a law, must find as a fact that the alleged statute passed both houses and was signed in open session, and that the bill “which has passed both houses” is the one approved.[31]
¶ 34. Wren then argued that the constitutional requirements (that both houses of the Legislature must pass a bill before presenting it to the governor) are “necessary elements in a valid statute,” and that they were “required by the constitution.”[32] He urged that the matter was open to judicial review, and that “[t]he court must find as a fact that the identical bill as passed was approved. These facts must exist to make the statute valid.”[33] Wren also argued that judicial review was required so that “the blunders of petty clerks may be prevented from becoming the solemn laws of the land.”[34]

Wren’s argument before the Court

¶ 35. At oral argument, Wren’s counsel set out the contrasting positions of his client, on the one hand, and the attorney general (who, interestingly, argued against judicial review) on the other:
On one side it is affirmed that the journals of the two houses may be consulted either by the courts on the ground that, being required to take judicial notice of what are the laws of the land, they may look at the journals, kept under a mandate of the constitution, as an authentic record of what the legislature did, or the courts may receive them as evidence if the issue of fact can be made; that any court may, without calling for proof, if the question of enacted or not enacted can be raised where an authenticated act, or what purports to be an act, is found on file in the office of the secretary of state, inspect the journals to determine it, without an issue of fact; but that in whatever form the question arises the journals may be consulted, and if they plainly show that the pretended act did not receive the assent of the two houses, it must be held to be a nullity.
On the other side, the proposition is that when there appears an authenticated act, duly filed in the office of the secretary of state, the question of enacted or not enacted cannot arise. It is not a question about the matter sought to be proved, as to the manner of the act, nor the kind of evidence which may be received, because no proof can be received as to any matter touching it. It is not open to inquiry whether the enrolled act passed or not. That unless the journals are by positive law made evidence on such a question, they are of no more weight than any other fact or circumstance, as no fact or circumstance can be brought forward. Investigation is shut out.
¶ 36. Wren’s counsel — as has the attorney general in the case before us today— advanced numerous other arguments, including the following: “Now, it is clear that our American constitutions are not *409 part of the common law, nor can that law circumscribe or hamper them or place artificial barriers to the assertion of right by the people, though it may assist in interpreting them;” and “[w]e insist that it is now the adjudged law of this State that the enrolled act in the office of the secretary of state is only prima facie evidence that the act was enacted and that the journals may be consulted, and if from the journal it appears that the act did not pass, it must on that evidence be declared void.”[35]

The Court’s decision in Wren

¶ 37. In deciding the issue, this Court first restated Wren’s position that the statute under which he was arrested, although facially valid, was “not to be accepted as a law”[36] because, from a review of “the journals of the senate and house”[37] it appeared that amendment 34 — the amendment that “related to that part of the bill which imposed the tax for the non — payment of which petitioner was arrested”[38] — passed the House and Senate, but
the act as approved by the governor [did] not contain said amendment 34 ...; wherefore it is alleged that the bill signed by the governor was not passed by both houses, and, therefore, is not a law, or if a law in part, is not as to the part under which the petitioner is detained.[39]
¶ 38. The Court then set out the precise question to be decided:
Is an act signed by the governor, after having been signed by the president of the senate and the speaker of the house of representatives in attestation of the fact that it had passed both houses, the sole evidence of its contents as passed by both houses ... ?[40]
¶ 39. Second, the Court set out three alternative resolutions to the issue. The third view — which the Court ultimately adopted and set out as the law of this State — was
that the enrolled act signed by the president of the senate and the speaker of the house of representatives and the governor is the sole expositor of its contents and the conclusive evidence of its existence according to its purport, and that it is not allowable to look further to discover the history of the act or ascertain its provisions.[41]
¶ 40. Departing from our usual practice of avoiding lengthy quotes, we now set forth in substantial part the Wren Court’s eloquent explanation of why it adopted the view that review of a facially valid legislative act is nonjusticiable:
The third view mentioned above meets our unqualified approval, because it is the simplest, the surest to avoid errors and difficulties, in accord with the constitution, and supported by an array of authority and a cogency of argument that commands our fullest assent. Every other view subordinates the legislature and disregards that coequal position in our system of the three departments of government. If the validity of every act published as law is to be tested by examining its history, as shown by the journals of the two houses of the legislature, there will be an amount of litigation, difficulty, and painful uncertainty appalling in its contemplation *410 and multiplying a hundred fold the alleged uncertainty of the law. Every suit before every court where the validity of a statute may be called in question as affecting the right of a litigant will be in the nature of an appeal or writ of error or bill of review for errors apparent on the face of the legislative records, and the journals must be explored to determine if some contradiction does not exist between the journals and the bill signed by the presiding officers of the two houses. What is the law is to be declared by the court. It must inform itself as best it can what is the law. If it may go beyond the enrolled and signed bill and try its validity by the record contained in the journals, it must perform this task as often as called on, and every court must do it. A justice of the peace must do it, for he has as much right and is as much bound to preserve the constitution and declare and apply the law as any other court, and we will have the spectacle of examination of journals by justices of the peace and statutes declared to be not law as the result of their journalistic history, and the circuit and chancery courts will be constantly engaged in like manner, and this court will, on appeal, have often to try the correctness of the determination of the court below as to the conclusion to be drawn from the legislative journals on the inquiry as to the validity of statutes thus tested. It is difficult enough often to say what an admitted statute means, and while we would not shrink from the investigation of all questions of fact on the existence of which any statute depends, we decline to review the legislative records to try the regularity of its action as to the manner of exercising its constitutional authority to enact laws, over which its power is as plenary as that of this court as to the manner in which it shall exercise its jurisdiction.
[[Image here]]
The fundamental error of any view which permits an appeal to the journals to see if the constitution has been observed in the passage by both houses of their enactments, is the assumed right of the judicial department to revise and supervise the legislative as to the manner of its performance of its appointed constitutional functions. It is the admitted province of the courts to judge and declare if an act of the legislature violates the constitution, but this duty of the courts begins with the completed act of the legislature. It does not antedate it. The legislature is one of the three co-ordinate and co-equal departments into which the powers of government are divided by the constitution, possessing all legislative power and not subject to supervision and control during its performance of its constitutional functions, nor to judicial revision afterward of the manner in which it obeyed the constitution its members are sworn to support. From necessity the judicial department must judge of the conformity of legislative acts to the constitution, but what are legislative acts must be determined by what are authenticated as such according to the constitution.[42]
¶ 41. The Court stated that the sound view was
to regard all of the provisions of the constitution as mandatory, and those regulating the legislative department as addressed to and mandatory to that body, and with which the courts have *411 nothing to do in the way of revision of how the legislature has performed its duty in the matters confided exclusively to it by the constitution.[43]
¶ 42. Finally, the Court characterized as “monstrous” and “full of mischief’ the notion that “every person on whom the law operates” may “look beyond the enrolled act duly signed as required by the constitution” to see if it was properly passed.[44] And then, as if responding to one of the arguments presented in dissent today, the Court said
But, it is said, the courts are guardians of the constitution, and if they do not look into the history of legislative doings that department may disregard the constitution as to the manner of passing laws. True, the courts are guardians of the constitution in the performance of their duty to decide causes, and should not shrink from declaring an act of the legislature enacted precisely in the mode prescribed by the constitution void if its provisions violate it; and, on the other hand, the courts should not arrogate the unconstitutional prerogative of reviewing and revising the course of legislative procedure in passing bills in the exercise of its clearly conferred right to pass them by virtue of an instrument containing injunctions binding on it, and sought to be enforced by the oath required of members, and not committed to the courts.[45]

State v. McPhail

¶ 43. The rule set out in Wren has been applied to the executive branch as well. In State v. McPhail, this Court stated that executive action must fall within the Constitution and laws of the State, and the facts must be such as to uphold or justify the exercise of the official authority exercised.[46] If an officer attempts to exercise an authority not legally vested in him, or attempts to do so when the state of facts does not entitle him to assert authority, such action is subject to judicial review.[47]
¶ 44. That said, however, the Court must recognize that some actions are of “a purely political nature,”[48] and “no writ of injunction or mandamus or other judicial remedial writ will run against the governor” unless personal or private property rights are interfered with.[49]
¶ 45. Here, the attorney general argues that the notice provision is a right reserved to the people — while we think it more likely the notice provision is about the right of the governor to receive complete information before granting a pardon. But even if the attorney general is correct that the publication provision confers a right to notice on the public, that right inures to the benefit of the public in general, and not to any particular private person. We are mindful that the victims and their families are entitled to be interested in the subject matter of this case, and they are undoubtedly — and understandably — concerned with its outcome. But no party stands before this Court claiming a violation of his or her personal or private property rights. The attorney general brings this claim on behalf of the State of Mississippi, and no particular individual. So, under McPhail, the exercise of *412 the pardon power — vested solely with the governor — is of “a purely political nature.” [50]

Montgomery v. Cleveland

¶ 46. As stated earlier, the issue before us is not whether the thirty-day-notice provision must be complied with — it must. Instead, the question to be resolved today is which branch has the final reviewing authority over whether the publication procedure was met.
¶ 47. In Montgomery v. Cleveland, this Court addressed Section 124 and stated— in unequivocal terms — that the governor
Is the sole judge of the sufficiency of the facts and of the propriety of granting the pardon, and no other department of the government has any control over his acts or discretion in such matters.[51]
And in Pope v. Wiggins, this Court elaborated:
Under § 124 of the Constitution of 1890, the power to grant pardons and to otherwise extend clemency, after the judicial process whereby one has been convicted of a crime has come to an end, is vested in the governor alone.... This power is not limited by any other provision of the State constitution, nor can the same be limited or restricted by either of the other two principal departments of the state government in the absence of a constitutional amendment so authorizing.[52]
¶ 48. The attorney general and the justices in dissent correctly argue that Section 124 places three limitations on the pardon power: (1) the Senate must consent to a pardon for treason; (2) no pardon shall be granted before conviction; and (3) a felon requesting a pardon must publish a petition for thirty days before the pardon shall be granted. While we agree that Section 124 places these limitations on the governor’s pardon power, we find these requirements no more compelling than the requirement in Wren: Legislative acts presented to the governor for signature must be passed by both legislative houses first.
¶ 49. And while we agree that the procedures at issue — passage by both houses for laws, and publication of notice by pardon applicants — are required, the courts may not investigate the inner workings of other branches of government to determine whether those procedural requirements were met.
¶ 50. We again state for clarity that this doctrine of nonjusticiability does not apply when the alleged constitutional defect violates personal or individual property rights. But that distinction has no application here, because the requirement that an applicant for a pardon publish notice to the public in the county where the crime was committed is not any particular individual’s personal or property right.
¶ 51. As this Court stated in Pope: “[T]he power to grant pardons and to otherwise extend clemency, after the judicial process whereby one has been convicted of a crime has come to an end, is vested in the governor alone.”[53] As Pope suggests, it is after conviction when the governor exercises the complete power.

*413
Hunt v. Wright

¶ 52. Hunt v. Wright, decided by this Court less than two years after our adoption of our current Constitution, involved a claim that this Court should declare unconstitutional a revenue bill that was passed during the last five days of a legislative session.[54] Section 68 of our Constitution states:
Appropriation and revenue bills shall, at regular sessions of the legislature, have precedence in both houses over all other business, and no such bills shall be passed during the last five days of the session.[55]
¶ 53. In finding the issue was not justi-ciable, this Court stated:
While the provision of Section 68[was] obligatory on the legislature, its disregard of it is beyond the reach of courts, which are not keepers of consciences of legislators, and deal only with what they do, and not what they should have done or omitted.[56]
¶ 54. This Court’s holding in Hunt concerning the legislative branch parallels our holding today concerning the executive branch.

Lang v. Board of Supervisors

¶ 55. In Lang v. Board of Supervisors, the claim was that a bill passed by the Legislature did not include the constitutionally required title.[57] Article 4, Section 71, requires that “[ejvery bill introduced into the legislature have a title, and the title ought to indicate clearly the subject-matter or matters of the proposed legislation.”[58] This Court held that, despite the alleged constitutional defect, the sufficiency of the title of a legislative bill is a legislative, not a judicial, question.
¶ 56. Although we have no previous case on point concerning pardons, we note that the Wyoming Supreme Court has faced this same issue. The Wyoming Constitution granted the governor the power to pardon, but also stated that “the legislature may by law regulate the manner in which ... pardons ... may be applied for.”[59] And a Wyoming statute required the applicant to publish notice of the application for pardon.[60]
¶ 57. In In re Moore, the petitioner was convicted of grand larceny.[61] The governor issued a pardon to the petitioner, but the petitioner was held in prison because of insufficient notice of application. The Wyoming Supreme Court held:
The inquiry by a court in a habeas corpus proceeding is merely as to the jurisdiction of the governor. We cannot inquire whether the pardoning power has been exercised judiciously, or whether the proceedings preliminary to the granting of the pardon were irregular, if any such were necessary.[62]
¶ 58. The Wyoming Court further stated that the notice provisions were directives on the applicant, and those moving on his behalf. But the governor “might grant a pardon upon his own knowledge, and upon his own motion, without any *414 application or any hearing.”[63]
CONCLUSION
¶ 59. We hold that a facially valid pardon,[64] issued by the governor — in whom our Constitution vests the chief-executive power of this state, and who is the head of the coequal executive branch of government [65] — may not be set aside or voided by the judicial branch, based solely on a claim that the procedural publication requirement of Section 124 was not met, or that the publication was insufficient. Our decision is in accord with the separation-of-powers doctrine set forth by the United States Supreme Court in Marbury v. Madison; and the express separation of powers mandated by the Mississippi Constitution and this Court’s precedent in Wren, McPhail, Montgomery, Wiggins, Hunt, and Lang. Accordingly, we reverse and render the decision of the Circuit Court of the First Judicial District of Hinds County and vacate the TRO as extended by the circuit court and this Court, and render judgment here finally dismissing the attorney general’s Second Amended Complaint and this action as barred by the doctrine of separation of powers.
¶ 60. REVERSED AND RENDERED.
CARLSON, P.J., LAMAR, KITCHENS, CHANDLER AND KING, JJ., CONCUR. CARLSON, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., LAMAR AND CHANDLER, JJ. CHANDLER, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON AND DICKINSON, P.JJ., AND LAMAR, J. WALLER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH AND PIERCE, JJ. RANDOLPH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND PIERCE, J. PIERCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., AND RANDOLPH, J.

. Miss. Const, art. 5, § 124 (1890).

. Miss. Const, art. 1, § 1 (1890).

. Miss. Const, art. 1, § 2 (1890).

. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

. Congress passed the Judiciary Act of 1789, expanding the Supreme Court's jurisdiction to include the original jurisdiction and authority to issue writs of mandamus "... to any courts appointed, or persons holding office, under the authority of the United States." Marbuiy, 5 U.S. at 148.

.Id. at 162.

. Marbury, 5 U.S. at 170.

. Nixon v. U.S., 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (internal citations omitted).

. Id.

. Id. at 226, 113 S.Ct. 732.

. Id. at 227, 113 S.Ct. 732.

. Id.

. Id. at 227-28, 113 S.Ct. 732.

. Id. at 288, 113 S.Ct. 732.

. Nixon, 506 U.S. at 228, 113 S.Ct. 732; U.S. Const, art. I, § 3, cl. 6.

. Nixon, 506 U.S. at 229, 113 S.Ct. 732.

. Id. at 231, 113 S.Ct. 732.

. Id.

. Id. at 234-35, 113 S.Ct. 732.

. Id. at 236, 113 S.Ct. 732 (internal quotations omitted) (emphasis added).

. Id. at 238, 113 S.Ct. 732.

.The Federalist No. 48 (James Madison) (emphasis added); see also Jeffery Jackson & Mary Miller et ah, eds., Encyclopedia of Mississippi Law § 19:17 (2010) (pardon power is a check on the judiciary); James Wilson, Executive Dept., Lectures on Law (1791); Joseph Story, Commentaries on the Constitution 3: §§ 1488-98 (1833).

. Ex Parte Wren, 63 Miss. 512, 1886 WL 3462 (Miss. 1886), 56 Am. Rep. 825 (1886).

. Id. at * 1.

. Id. at *8.

. Id. at *6.

. Id. at * 1.

. Id.

. We have recited the quote from the Attorney General’s brief, but the bracketed language is ours. We included it to demonstrate *408 the parallel between the Wren case and the case before us today.

. Wren, 1886 WL 3462, at *2.

. Id. at *2.

. Id. at *3.

. Id.

. Id. at *6.

. Id. at **7, 9.

. Id. at *13.

. Id.

.Id.

. Id.

. Id.

.Id. at *14.

. Id. at **16-17.

. Id. at *17.

. Id. at *18.

. Id.

. State v. McPhail, 182 Miss. 360, 180 So. 387, 391 (Miss.1938).

. Id.

. Id.

. Id.

. Id.

. Montgomery v. Cleveland, 134 Miss. 132, 98 So. 111, 114 (1923); see also State v. Kirby, 96 Miss. 629, 51 So. 811, 812 (Miss.1910) ("The sole power to pardon is confided by the Constitution to the Governor....”).

. Pope v. Wiggins, 220 Miss. 1, 69 So.2d 913, 915 (1954) (emphasis added).

. Id. at 915 (emphasis added).

. Hunt v. Wright, 70 Miss. 298, 11 So. 608 (1892).

. Miss. Const, art. 4, § 68 (emphasis added).

. Hunt, 11 So. at 610.

. Lang v. Bd. of Supervisors, 114 Miss. 341, 75 So. 126 (1917).

.Miss. Const, art. 4, § 71.

. Wyo. Const, art. 4, § 5.

. Rev. St. Wyo. T. §§ 3367-70.

. In re Moore, 4 Wyo. 98, 31 P. 980 (1893).

. Id. at 982 (internal citations omitted).

. Id. at 981.

. Justice Randolph attempts to compare the facially-valid driver's license in Cousin v. Enterprise Leasing Co.-South Cent., Inc., 948 So.2d 1287 (Miss.2007) (Dickinson, J., dissenting), to the facially-valid pardons here. We were under the impression in Cousin that the Mississippi Department of Public Safety— which is not one of our three branches of government-issued the driver’s license. No one in that case suggested that the governor, personally, issues drivers’ licenses in Mississippi. Had that fact been established, I would not have dissented.

.Miss. Const, art. 5, § 116 (1890).