# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-M-01072-SCT

*RICKY W. WARD*

*v.*

*DOROTHY WINSTON COLOM*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/18/2011 |
| TRIAL JUDGES: | HON. DOROTHY WINSTON COLOM |
| | HON. KENNETH M. BURNS |
| | HON. H. J. DAVIDSON, JR. |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CHANCERY COURT |
| ATTORNEY FOR PETITIONER: | THOMAS E. PAYNE |
| FOR RESPONDENTS: | DOROTHY WINSTON COLOM |
| | KENNETH M. BURNS |
| | H. J. DAVIDSON, JR. |
| NATURE OF THE CASE: | MISCELLANEOUS |
| DISPOSITION: | VACATED - 06/07/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     In 2011, the Mississippi Legislature amended Mississippi Code Section 97-37-7, granting enhanced concealed-carry licensees the privilege of carrying a concealed firearm in the courthouses of this state, save for courtrooms, which the Legislature left within the province of judges.[1]  Litigants, witnesses, and family members who do not have enhanced

---

[1] The statute explicitly prohibits firearm possession in a courtroom "during a judicial proceeding," but also states that "[t]his section shall in no way interfere with the right of a trial judge to restrict the carrying of firearms in the *courtroom*." Miss. Code Ann. § 97-37-7(2) (Rev. 2014) (emphasis added).

concealed-carry licenses are subject to the general ban found in Mississippi Code Section 97-37-1 (Rev. 2014), which makes carrying a concealed weapon illegal for persons without enhanced concealed-carry licenses. Nonetheless, the three chancellors of the Fourteenth Chancery District, on their own motion, issued a court order prohibiting enhanced concealed-carry licensees from possessing a firearm in and around courthouse buildings of the Fourteenth District.

¶2. Thereafter, Ricky Ward, an enhanced concealed-carry licensee, filed a petition to modify or dismiss the order. The chancellors issued another order denying Ward's petition and reiterated that enhanced concealed-carry licensees would be prohibited from possessing a firearm in all Fourteenth District courthouses. Ward then filed an Extraordinary Writ of Prohibition in this Court, seeking to have the orders vacated as unconstitutional and in direct conflict with state law.

¶3. This Court ordered additional briefing, requesting the parties to address the following issues:

(1) What is the authority of judges to exercise control over security issues beyond the four walls of the courtroom itself?

(2) Whether the judiciary has the inherent authority to exercise control of security extending beyond the four walls of a courtroom.

(3) Whether Mississippi Code Section 97-37-7(2) prohibits judges from controlling courthouse security. Specifically, what is the definition of "courtrooms during a judicial proceeding," and does that definition either allow or prohibit judges from exercising control of security beyond the four walls of a specific courtroom while court is in session?

(4) If Mississippi Code Section 97-37-7(2) does prohibit judges from exercising control over courthouse security, whether it violates the separation of powers doctrine.

¶4.    The Attorney General, National Rifle Association, Attorney Virgil Gillespie, and Chancellor James Persons[2] also filed briefs.

¶5.    Having considered the law and arguments offered by the aforementioned, the Court finds that the orders are facially unconstitutional. Furthermore, the orders defy existing Mississippi statutory and caselaw. Accordingly, the orders are vacated. They are *nullius juris*–of no legal force.[3]

**I.    The orders defy the Mississippi Constitution**.

¶6.    Article 1, Sections 1 and 2 of the Mississippi Constitution establish clear lines of demarcation among the three branches of government. Section 1 establishes that the executive, legislative, and judicial branches of our state government are separate and co-equal: "The powers of the government of the State of Mississippi shall be divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another." Section 2 provides that no person belonging to one of those departments "shall exercise any power properly belonging to either of the others." In other words, when the executive branch or legislative branch has been properly delegated a power, the judiciary is without authority to assume that power.

---

[2] Nine other chancellors and the Conference of Circuit Judges joined Chancellor Persons's brief.

[3] *Nullius juris*, Black's Law Dictionary 1217 (Rev. 4th ed. 1968).

¶7. One of the clearest delegations of legislative power in our Constitution is found in Article 3, Section 12. It provides: "The right of every citizen to keep and bear arms in defense of his home, person, or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the *Legislature* may regulate or forbid carrying concealed weapons." (Emphasis added.) Without equivocation, the Legislature is the branch of government that the citizens of Mississippi chose to regulate or forbid concealed weapons.

¶8. A plain reading of these provisions in our Constitution renders the orders unconstitutional on their face, for "no set of circumstances exists under which the [orders] would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed. 2d 697 (1987). "[T]he key to a successful facial challenge . . . is whether [the orders], as [they are] currently written, *could never* be constitutionally applied and valid." *Crook v. City of Madison*, 168 So. 3d 930, 942 (Miss. 2015) (Coleman, J., dissenting) (emphasis in original). Applying this standard to the present case, the chancellors' orders, as they currently are written, could never be constitutional. The Mississippi Constitution vests only the Legislature with the authority to regulate or forbid carrying concealed weapons. The orders at issue usurp that power.

¶9. Notwithstanding the clarity of our Constitution and the statute, the chancellors urge this Court to approve their actions as an "inherent power," despite the orders reaching beyond the Constitution. The chancellors cite *Newell v. State*, 308 So. 2d 71, 72 (Miss. 1975), and *Hosford v. State*, 525 So. 2d 789 (Miss. 1988).

4

¶10.    While *Newell* establishes Mississippi courts' "inherent power," it clearly holds such power is limited by the Constitution and separation-of-powers doctrine. *See Newell*, 308 So. 2d at 76-77 (holding the Court's inherent powers emanate from the separation-of-powers doctrine in the Constitution, but also holding that "[t]he phrase 'judicial power' in [S]ection 144 of the Constitution includes the power to make rules of practice and procedure, *not inconsistent with the Constitution . . . .*") (emphasis added).  A review of the Mississippi Constitution, the Code, and caselaw reveals that judges do not have "inherent power" to control security beyond their courtrooms or to regulate concealed weapons outside their courtrooms.  These powers are nonexistent, for there simply is no language in our Constitution that grants courts such power, and "this Court must declare the Mississippi Constitution as it is written . . . ." *In Re Hooker*, 87 So. 3d 401, 423 (Miss. 2012) (Randolph, P.J., dissenting).  Turning to the separation-of-powers doctrine, the Constitution specifically vests the Legislature with authority to regulate concealed weapons.  The judicial branch therefore is without constitutional authority to exercise that power, for it properly belongs to the Legislature, as mandated by our Constitution.  Miss. Const. art. 1, § 2.

¶11.    The chancellors next argue that *Hosford* provides validity to the orders. *Hosford*, 525 So. 2d at 789.  In *Hosford*, a trial judge petitioned this Court for direction regarding how to handle external noise affecting trial court proceedings. *Id.* at 797.  Examining the Constitution and state law, this Court held that it is the statutory duty of boards of supervisors and the sheriff to provide adequate court facilities and security for each county. *Id.*  The *Hosford* Court held that *if*, and *only* if, either the board of supervisors, sheriff, or the

Legislature fail in their constitutional and statutory obligations to enable the judicial branch to operate, *then*, and *only* then, can "the Judicial branch [have] the authority as well as the duty to see that courts do not atrophy." *Hosford*, 525 So. 2d at 798. The record reveals that no such claim has been advanced in this case.

¶12.    In a unanimous[4] opinion penned just three years ago by this Court, we expressly rejected a similar attempt by a circuit judge. *Lewis v. Hinds Cty. Circuit Court*, 158 So. 3d 1117, 1119 (Miss. 2015). In *Lewis*, this Court was presented with a dispute between the Hinds County Sheriff and the Hinds County Circuit Court that arose from another local court order, which attempted to prescribe several requirements on the sheriff, sheriff's deputies, and bailiffs by which to abide in carrying out their statutory duties. *Id.* at 1125-26.  The Hinds County order contained sections which addressed the hours, uniform, discipline, and duties of bailiffs, *inter alia*.  *Id.*  One section of the order stated that "the sheriff must establish a discipline for the *security* and maintenance of the court *that must be approved by the court . . . .*" *Id.* at 1125 (emphasis added).  Applying the aforementioned constitutional separation-of-powers principles, this Court held that, under Article 5, Section 135 of the Mississippi Constitution, "[t]he sheriff is a member of the executive branch of government," and is "'the executive officer of the circuit and chancery court of his county.'" *Id.* at 1124 (citing multiple authorities). We further held that, under Mississippi Code Section 19-25-69 (Rev. 2012), "the Legislature has given the sheriff the duties of protecting the courthouse." *Id.* at 1123.  Because the order required judges to approve security measures—a statutory

---

[4]Justice Coleman wrote for the unanimous Court, joined by Chief Justice Waller, Presiding Justices Randolph and Kitchens, and Justice King.

duty of the executive branch—this Court found that section "to be void in full" because it completely contradicted statutory law. ***Id.*** at 1126.

¶13.    *Lewis* established that the judiciary is without "inherent power" to exercise control of security extending beyond the courtroom, as "'[n]o . . . governmental official[] can exercise power beyond their constitutional authority.'" ***Id.*** at 1124-25 (quoting ***Barbour v. State ex rel. Hood***, 974 So. 2d 232, 239 (Miss. 2008)) (citations omitted).  By striking the aforementioned section of the Hinds County order, this Court held that the judiciary's authority to control security begins and ends at the courtroom door.  Any attempt by the judiciary to assume or exercise control over the statutory responsibilities of the executive branch is void.

## II.    The orders defy statutory law.

¶14.    Pursuant to its constitutional authority, the Legislature amended Mississippi Code Section 97-37-7(2) authorizing certain categories of people,[5] including enhanced concealed-carry licensees, to carry a concealed pistol in courthouses[6] except in courtrooms[7] during a judicial proceeding, so long as they also (1) meet specific requirements under Mississippi

---

[5] The statute encompasses law enforcement officers, investigators for the Attorney General, judges, and Department of Corrections officers, *inter alia.*

[6] *Courthouse*: "1. A building housing judicial courts. 2. A building housing county government offices." Webster's II New College Dictionary 260 (2001).

[7] *Courtroom*: "A room in which the proceedings of a court of law are held." Webster's II New College Dictionary at 260.  Justice Chamberlin's special concurrence opines that proceedings of a court of law may require more than one room.

7

Code Section 45-9-101 (Rev. 2015)[8] and (2) have voluntarily completed an instructional course in the safe handling and use of firearms. Miss. Code Ann. § 97-37-7(2) (Rev. 2014).[9] The statute specifically exempts "courtrooms during a judicial proceeding," and further states that "[t]his section shall in no way interfere with the right of a trial judge to restrict the carrying of firearms in the *courtroom*." *Id.* (emphasis added).

¶15.    "In considering a statute passed by the Legislature, . . . the first question a court should decide is whether the statute is ambiguous. If it is not ambiguous, the court should simply apply the statute according to its plain meaning and should not use principles of statutory construction." ***Barbour***, 974 So. 2d at 240 (internal citations omitted) (quoting ***Miss. Dep't of Transp. v. Allred***, 928 So. 2d 152, 154 (Miss. 2006)) (citation omitted). In deciding the first question, as we must, there is simply no ambiguity in Section 97-37-7:

---

[8] The statute provides that the Department of Public Safety shall issue a license if the applicant meets the training requirement set forth in Section 97-37-7, certain age and residency requirements, and: (1) does not suffer from a physical infirmity which prevents the safe handling of a firearm; (2) is not ineligible to possess a firearm by virtue of a felony conviction; (3) does not chronically and habitually abuse controlled substances; (4) does not chronically and habitually use alcoholic beverages; (5) has not been adjudicated as mentally incompetent, or has waited five years since a court's restoration of his capacity; (6) has not been voluntarily or involuntarily committed to a mental institution or mental health treatment facility, unless a psychiatrist issues a certificate that the applicant has not suffered from the disability for five years; (7) has not had adjudication of guilt withheld or sentence suspended on any felony unless three years have elapsed since probation or conditions set by the court have been fulfilled; (8) is not a fugitive from justice; and (9) is not disqualified to possess a weapon based on federal law.

[9] The privilege to carry a concealed weapon into a courthouse is not conferred on every gun-permit holder, much less every citizen of our state. The authority to carry in courthouses impacts *only* the individuals who have demonstrated that they are trained in the handling of weapons, are  physically and mentally fit to possess and operate a firearm, and have proven that they have not committed a felony. The rights of enhanced-carry holders are at the center of the controversy before the Court.

8

enhanced concealed-carry licensees may possess a concealed weapon in a courthouse, except in courtrooms, which the Legislature left within the province of judges.

¶16.    Courts must enforce the law "unless it appears *beyond all reasonable doubt* to violate the Constitution." *Tunica Cty. v. Town of Tunica*, 227 So. 3d 1007, 1015 (Miss. 2017) (quoting *Pathfinder Coach Div. of Superior Coach Corp. v. Cottrell*, 216 Miss. 358, 62 So. 2d 383, 385 (Miss. 1953)) (emphasis in original).  The parties have failed to prove beyond a reasonable doubt that Mississippi Code Section 97-37-7 is unconstitutional.  *Id.*  The "inherent power" of Mississippi courts, which is limited by our Constitution, lends no support to the dissenting justices' opinions that the statute is unconstitutional.  *See Newell*, 308 So. 2d at 76-77; *see also* Spec. Conc. ¶ 22 (Maxwell, J.).  Thus, we are duty-bound to enforce the law as written.  Applying a plain reading of Section 97-37-7 to the orders at issue, the chancellors effectively repealed a statute as applied to the seven courthouses of the Fourteenth Judicial District, which is, *ipso facto*, a violation of Mississippi law.  *See Lewis*, 158 So. 3d at 1125 ("[C]ourt[s] may not issue orders that contradict statutory law. . . .")

### III.    Conclusion

¶17.    The chancellors may have good and noble intentions, and their concerns are well-founded.  However, their personal fears and opinions do not trump, and cannot negate, constitutional guarantees.  The ultimate outcome of today's issue is reserved for the Legislature, not to be commandeered by unilateral local judicial proclamations. Courts must give more than lip service to the rule of law; they must insist upon its lawful application. Judges cannot allow their sense of superior knowledge, perceptions, or understandings to

9

justify open defiance of the very laws that they are called upon to uphold. Indeed, we have held repeatedly that courts are guardians of the Constitution,[10] not guardians of the courthouse. Without question, the orders defy existing law and seek to exercise a power that plainly is reserved for the other branches of government. The orders contain no authority to suggest otherwise. The law of Mississippi is clear: enhanced-carry licensees are permitted to possess a firearm in courthouses. No matter how well-intentioned, judges are without the power to limit enhanced concealed-carry licensees' right to carry a firearm beyond courtrooms in the State of Mississippi. The orders are vacated.

¶18. **VACATED.**

**COLEMAN, MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR. MAXWELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., COLEMAN, CHAMBERLIN AND ISHEE, JJ. CHAMBERLIN, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., MAXWELL AND ISHEE, JJ.; WALLER, C.J., AND BEAM, J., JOIN IN PART. WALLER, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY BEAM, J. BEAM, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.; WALLER, C.J., AND BEAM, J., JOIN IN PART.**

**MAXWELL, JUSTICE, SPECIALLY CONCURRING:**

¶19. I agree with the majority that, while certainly well-meaning, the chancellors' orders prohibiting enhanced concealed-carry licensees from possessing firearms in courthouses of

---

[10] *Legislature of State v. Shipman*, 170 So. 3d 1211, 1226 (Miss. 2015) (Randolph, P.J., concurring in part and in result); *In re Hooker*, 87 So. 3d 401, 411 (Miss. 2012); *Hall v. State*, 539 So. 2d 1338, 1349 (Miss. 1989) (Hawkins, J., dissenting); *Ex parte Wren*, 63 Miss. 512, 535 (Miss. 1886).

the Fourteenth District are overly broad and facially unconstitutional as applied. Thus, we have no option but to vacate them.

¶20. Article 3, Section 12 of Mississippi's Constitution is crystal clear. Its text expressly delegates to the Legislature the authority to regulate concealed weapons:

> The right of every citizen to keep and bear arms in defense of his home, person, or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, ***but the Legislature may regulate or forbid carrying concealed weapons.***

Miss. Const. art. 3, § 12 (emphasis added).

¶21. Whether by wisdom or folly, Mississippi's Legislature has exercised its express constitutional power to authorize a small class of concealed-carry licensees to possess firearms in non-courtroom areas of courthouses. While I understand and share some of the chancellors' concerns, neither my own personal observations or experiences, nor those of others, trump *express* constitutional authority.

¶22. I do, however, emphasize that our judiciary has inherent constitutional authority to secure its courtrooms. But the orders here broadly apply to non-judicial hallways, rooms, and offices located within the District's courthouses—areas that by no definition qualify as courtrooms. Further, to the extent the dissenting justices rely on inherent-authority cases from other jurisdictions, they fail to acknowledge a glaring difference between the constitutions of those states and Mississippi's. That prominent distinction is that not one of the cited states has a constitutional provision like Mississippi's—a constitutional provision that expressly authorizes the Legislature to regulate the concealed carry of firearms.

11

**RANDOLPH, P.J., COLEMAN, CHAMBERLIN AND ISHEE, JJ., JOIN THIS OPINION**.

**CHAMBERLIN, JUSTICE, SPECIALLY CONCURRING:**

¶23.    I agree with the analysis of the majority and its ultimate holding that the Mississippi Constitution and the doctrine of separation of powers require nullification of the orders in question.  However, as the Legislature clearly recognized, judges are in control of their courtrooms.  Courtrooms (while in session) are specifically excluded from the legislation.

¶24.    A courtroom is not always an easily defined structure.  Judges must have discretion in defining the courtroom (i.e., judges' chambers, witness rooms, jury rooms, etc.).  Further, the design of some courthouses may still require jurors to exit the main courtroom and travel through a public hallway to the jury room.  The same applies to witness rooms.  A judge certainly has the right to deem these areas to be part of the courtroom while court is in session.

¶25.    Though not specifically before us, as set forth in *Hosford*, judges may have the authority to step outside of the courtroom limitation where the facts of a specific case so warrant.  *Hosford v. State*, 525 So. 2d 789, 797–98 (Miss. 1988).  This might include issues such as gang-related trials or highly emotional circumstances such as those involving crimes against children.  This is allowed only upon specific findings of such exigent circumstances.

¶26.    However, the orders at issue today are merely blanket orders that overstep the authority of the judges and attempt to negate the constitutionally backed legislation. Remote hallways and nonjudicial offices certainly are not courtrooms under any definition of the word.  I, therefore, specially concur.

12

**RANDOLPH, P.J., MAXWELL AND ISHEE, JJ., JOIN THIS OPINION. WALLER, C.J., AND BEAM, J., JOIN THIS OPINION IN PART.**

**WALLER, CHIEF JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶27.    The trial judges in this State possess the inherent, constitutional authority to secure their courtrooms for the fair, efficient, and independent administration of justice. However, because the subject order is facially overly broad, I would vacate the trial-court order without prejudice for the trial judges to enter specific detailed analysis in a modified order supporting gun-carrying restrictions beyond the courtroom for the security of the courtroom.

¶28.    "The judicial power of the State shall be vested in a Supreme Court and such other courts as are provided for in this Constitution." Miss. Const. art. 6, § 144. The "judicial power" has roots in the common law. *Yazoo & M.V.R. Co. v. Scott*, 108 Miss. 871, 67 So. 491, 494 (1915) ("[A] court possesses certain inherent powers being derived from the common law."). One such common-law power is the authority of trial judges over their courtrooms. *Lewis v. Hinds Cty. Circuit Court*, 158 So. 3d 1117, 1125 (Miss. 2015) ("We hold that courts have inherent power over their courtrooms . . . ."); *see also United States v. Spellissy*, 374 F. App'x 898, 900 (11th Cir. 2010) ("Courts have inherent powers derived from common law that assist in exercising their enumerated judicial powers, such as managing their cases and courtrooms."). As a corollary, a trial court's authority over its courtroom may necessarily extend to areas adjacent to the courtroom, required to secure the courtroom itself.

13

¶29.  This Court has not been called upon to answer the exact question of a trial court's inherent authority to regulate firearms within the courtroom, but other states have. In New Hampshire, the legislature enacted a statute that provided, "[n]otwithstanding any other rule, regulation or order to the contrary, law enforcement officers shall be permitted to wear firearms in any courtroom in the state." *State v. LaFrance*, 124 N.H. 171, 175, 471 A.2d 340, 341 (1983) (emphasis omitted). Pursuant to a local policy, the trial court prohibited an officer from wearing his firearm into the courtroom. *Id.* The New Hampshire Supreme Court upheld the trial court's action, holding that "it is clear that trial judges, subject to our review, have authority under the judicial power of the constitution to control the wearing of firearms in the courtroom." *Id.* at 182.  Similarly, the Supreme Court of Alaska has observed that courts have the "inherent authority to control, prohibit or direct the possession of firearms on court premises." *State v. Alaska Pub. Emp. Ass'n*, 644 P.2d 236, 238 n.1 (Alaska 1982).

¶30.  I do not view a trial court's inherent authority to secure the courtroom expansively. This is a factually intensive analysis that depends, in part, on the physical characteristics of the spaces surrounding the courtroom. Factors to be reviewed may include, for example, the number of doors in the courthouse and courtroom, how the public enters the courtroom and courthouse, how the judge's chambers are accessed, how prisoners with court appearances are admitted into the courtroom and where they are held prior to and after court appearances, where witness rooms and jury-deliberation rooms are located in relation to the courtroom, and, finally, whether security resources exist to provide the required physical and electronic security in view of the number of doors and physical layout of the courthouse.  Stated

14

differently, a trial court may impose only those measures that are necessary to secure the courtroom and the efficient disposition of judicial business conducted therein. ***Hosford v. State***, 525 So. 2d 789, 797 (Miss. 1988).

¶31. This application of inherent authority comports with the understanding of judicial power throughout the states. *See **Ex parte City of Birmingham***, 134 Ala. 609, 616, 33 So. 13, 15 (1902) ("[E]very court of record [h]as inherent power, irrespective of statute, to make rules for the regulation and transaction of its business . . . ."); ***State ex rel. Finley v. Pfeiffer***, 163 Ohio St. 149, 154, 126 N.E.2d 57, 61 (1955) ("Assuredly, a court of general jurisdiction has great inherent power to acquire and control the ordinary facilities [that] are essential to secure and safeguard the free and untrammeled exercise of its functions."); ***State v. Wadsworth***, 139 Wash. 2d 724, 741, 991 P.2d 80, 90 (2000) ("Under the inherent powers of the courts, the judiciary has authority to administer justice and to ensure the safety of court personnel, litigants and the public."). As the United States Supreme Court has observed:

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." ***United States v. Hudson***, 7 Cranch 32, 34, 3 L. Ed. 259 (1812); *see also **Roadway Express, Inc. v. Piper***, 447 U.S. 752, 764, 100 S. Ct. 2455, 2463, 65 L. Ed. 2d 488 (1980) (citing ***Hudson***). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." ***Anderson v. Dunn***, 6 Wheat. 204, 227, 5 L. Ed. 242 (1821); *see also **Ex parte Robinson***, 19 Wall. 505, 510, 22 L. Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." ***Link v. Wabash R.R. Co.***, 370 U.S. 626, 630–631, 82 S. Ct. 1386, 1388–1389, 8 L. Ed. 2d 734 (1962).

***Chambers v. NASCO, Inc.***, 501 U.S. 32, 43, 111 S. Ct. 2123, 2132, 115 L. Ed. 2d 27 (1991).

¶32.    In accordance with these well-established principles, the trial courts of this State have the inherent authority to prohibit firearms as necessary to secure their courtrooms. In the statute at issue, the Legislature impliedly recognizes this power of the trial courts: "This section shall in no way interfere with *the right of a trial judge* to restrict the carrying of firearms in the courtroom." Miss. Code Ann. § 97-37-7(2) (Rev. 2014) (emphasis added). This power, of necessity, cannot be a bright line at the courtroom door. There are more than ninety-two courthouses scattered throughout our eighty-two counties.[11] Our Supreme Court courtroom has a modern design with secure access for judges and court personnel, electronic monitors, and one, easily controlled public entrance into the courtroom. A bright-line rule without regard to the physical design of the courtroom as it is situated in the courthouse limits the judicial power of the courts over their courtrooms, and therefore, Section 97-37-7(2), as applied by the majority, violates the separation of powers under our Constitution. Miss. Const. art. 1, § 1; *see also **Newell v. State***, 308 So. 2d 71, 76 (Miss. 1975).[12]

---

[11]The number ninety-two is based on the presence of at least one courthouse in every county and two for the ten counties with two judicial districts. Many counties have separate courthouses for circuit and chancery courts. The Amite County Courthouse appears to be the oldest courthouse still in use, having been built between 1839 and 1841. National Park Services, https://npgallery.nps.gov/AssetDetail/42cc1802-b7b2-4e6d-96c2-71d7a112cd62 (last visited June 6, 2018).

[12]This bright-line rule set out in the majority opinion would restrict a trial judge from directing additional secured spaces outside the courtroom for high-profile cases such as ***De La Beckwith v. State***, 707 So. 2d 547 (Miss. 1997), and ***Killen v. State***, 958 So. 2d 172 (Miss. 2007).

16

¶33. As the order under review is facially overbroad, particularly as to the courthouse premises, I would vacate the subject order without prejudice, giving the trial judges an opportunity to enter a specific detailed analysis in a modified order to show why gun-carrying restrictions past the courtroom are necessary to provide minimally adequate security for the courtroom.

**BEAM, J., JOINS THIS OPINION.**

**BEAM, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶34. The majority's holding today that judges are without authority to control the security outside their courtrooms renders a sad day for justice in Mississippi. I have witnessed first-hand the volatility that embodies the courthouse in situations where emotions are running high in even the most reasonable and steadfast citizens among us. Knowing that litigants, witnesses, and court participants are secure in the sacred halls of the courthouse is imperative to assure "justice for all."

¶35. I agree with Justice King that the chancery court's order is an appropriate exercise of inherent judicial authority, and that Section 97-37-7(2) as applied to the courts violates the separation of powers. However, I agree with Chief Justice Waller that extending a prohibition on firearms out into the parking lot (within 200 feet of any entrance door to the courthouses) may be overly broad. Thus, I would vacate the subject order without prejudice, and allow the trial judges to enter a specific, detailed analysis in a modified order for security restrictions beyond the courtroom walls.

**WALLER, C.J., JOINS THIS OPINION.**

17

**KING, JUSTICE, DISSENTING:**

¶36. Because the chancellors' orders are a valid exercise of their inherent power and do not violate the Mississippi Constitution, I dissent.

## FACTS AND PROCEDURAL HISTORY

¶37. On July 1, 2011, it became the law that enhanced concealed carry permit holders "shall also be authorized to carry weapons in courthouses except in courtrooms during a judicial proceeding[.]" Miss. Code Ann. § 97-37-7(2) (Rev. 2014). On November 28, 2011, the chancellors of the Fourteenth District issued an order prohibiting those permit holders from carrying weapons

> within 200 feet of any door to any courtroom which said courtrooms shall be extended coextensive with any entrance door to any of the following Courthouses served and part of the 14th Judicial District, the same to include, Lowndes County, Oktibbeha County, Clay County, Noxubee County, Chickasaw County (1st and 2nd District), and Webster County.[13]

The order explicitly found that

> . . . [T]he carrying of a concealed weapon in any Courthouse by any party other than a law enforcement officer in carrying out his/her official business is an unreasonable danger to the public, courthouse and court personnel, and Judges. Courthouses are often places where the business of the public is conducted on a day to day basis and those activities are not inherently more dangerous than other locations. However, courthouses are frequently places where, during court sessions, emotions of family members and litigants are extremely high, whether they are families of victims and/or the accused, in Circuit court or those facing divorce, financial pressures or loss of a child or children in Chancery Court. The possibility of violence or harm at that time is therefore much more likely.

---

[13]A July 1, 2013, order, entered in response to additional statutory law, essentially reiterated the November 2011 order.

The order acknowledged that the law allows a trial judge to restrict the carrying of firearms in a courtroom, but it went on to make specific findings regarding the security of the courthouses of the Fourteenth District:

> . . . [A]ll of the six courthouses served by the 14th Chancery District were built and designed many years ago, when one of the main purposes was to make them accessible by many doors and corridors for the convenience of the general public and safety was not the foremost concern. All of those Courthouses have two or more doors and numerous accesses to courtrooms and Judge's chambers within the buildings. It is not cost effective or would it be to secure to the extent necessary for the respective counties to provide security that would be adequate to deter any person intent on doing harm to any other person including Court and Courthouse personnel within the buildings themselves. Many of the doors leading to the courtrooms are mere feet from the Bench, the clerk's table and the witness stand. To allow a person legally to carry a concealed weapon to the courtroom door poses a threat that can not [sic] be deterred before great bodily harm or death could be inflicted inside the courtroom.

¶38. Ricky Ward filed a Petition to Modify or Dismiss Order of the Court in the Fourteenth District, alleging that a court has no jurisdiction to establish security protocols for the courthouses, that as an enhanced license holder he is "directly impacted" by the court's order, and that a substantial change in circumstance occurred, and requesting that the court amend or dismiss its November 2011 order in order to conform with the laws of Mississippi. The court dismissed the petition, finding that it simply defined "courtroom" and that judges "have the authority to enter such administrative orders as may be necessary in their estimation for the proper administration of justice, to further the efficiency of the Courts, and to make sure that the legal system is fair and just." It noted that:

> The seven courthouses of this District were all built many years ago and not designed to properly secure Courtrooms. The litigants, witnesses and families, more often than not, are in the hallways outside of the Courtrooms during most

of a trial. These trials include divorces, child custodies, domestic violence and other very emotional and inflammatory issues.

The court also opined that Ward lacked standing to challenge the order.

¶39. Ward then filed a Petition for Writ of Prohibition[14] with this Court, asking this Court to find the order unconstitutional and in direct conflict with statutory law. This Court ordered the chancellors of the Fourteenth District to file an answer to the petition. In their response, the chancellors argue that the courtroom and the courthouse corridors "must be considered as one common unit, both necessary to meet the ends of justice. One must be used to reach the other." They maintain that:

> [i]t is ludicrous to assume that people in heightened states of emotional upheaval would pause to decide where in the building they can be mad and where they cannot! Most of the confrontations that have occurred in this district, thus far, do so outside the hearing room. For whatever reason, persons entering the hearing room and seeing the Chancellor on the bench usually are much more restrained than in the halls.

The order, they assert, therefore defined the courtroom, because the Courts must "define the parameters of what is necessary to the safe and orderly administration of justice." For example, "the intimidation by a divorce litigant with a firearm toward his antagonist is, without question, a deterrent to the free development of the facts necessary and the administration of justice." They note that the decision was also based on the structure and cost to secure the specific courthouses served. They argue that it is the courts' responsibility

---

[14]In the case at hand, the court entered an order regarding *its own functioning and the administration of justice*. This Court has acknowledged that courts have such authority. *See Lewis v. Hinds Cty. Circuit Court*, 158 So. 3d 117 (Miss. 2015).

20

to provide justice. In doing so, they argue that the courts "have inherent authority to make local rules to foster the goal of the complete administration of justice."

¶40. As the majority notes, this Court then ordered additional briefing. Ward, the Fourteenth District, the Attorney General, and three amici filed briefs. Ward, the Attorney General, and the National Rifle Association as amicus argue that the order is invalid. The Fourteenth District, Virgil Gillespie, an attorney with chancery court experience, and Chancellor James Persons argue that the order is a valid exercise of judicial authority. Nine chancellors[15] and the Conference of Circuit Judges joined in Chancellor Persons's amicus brief.

## ANALYSIS

¶41. The crux of the analysis is whether the Fourteenth District chancellors had the authority to exercise control of security beyond the four walls of their courtrooms via the challenged order.[16]

### A. The Mississippi Constitutional Right to Bear Arms

¶42. The Mississippi Constitution of 1890 provides that "[t]he right to every citizen to keep and bear arms in defense of his home, person, or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the Legislature may regulate

---

[15]Chancellors Carter O. Bise, Jaye A. Bradley, E. Vincent Davis, John A. Hatcher, Gerald Martin, Lawrence Primeaux, Jennifer T. Schloegel, David Shoemake, and Sandy Steckler all joined Chancellor Persons's brief.

[16]The majority asserts that the chancellors have repealed the concealed carry law as applied to their courthouses. Maj. Op. ¶16. The chancellors have done no such thing. The chancellors have simply found that they cannot attend to their constitutional duty to fairly administer justice if weapons are brought into the courthouses of the Fourteenth District.

21

or forbid carrying concealed weapons." Miss. Const. art. 3, § 12. The majority suggests that the phrase "the Legislature may regulate or forbid carrying concealed weapons" is a separation of powers provision vesting the Legislature with the sole power to *allow* concealed weapons in courthouses. Such an interpretation ignores the original intent of this provision, which was to allow the Legislature to restrict and prohibit concealed carry, not to expand it. Moreover, the right to bear arms in the Mississippi Constitution is a right *only* "to keep and bear arms *in defense* of his home, person, or property, or in aid of the civil power when thereto legally summoned." Miss. Const. art. 3, § 12 (emphasis added). By the plain language of the Constitution, the right to keep and bear arms is narrowly drawn to provide that right only for defense.

¶43. In interpreting constitutional text, a court may use as a guide the idiomatic understanding of the text at the time it was drafted to inform its analysis. ***District of Columbia v. Heller***, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) (Scalia, J., for the Court). The Mississippi Constitution, like that of the federal government, was "written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Id.* at 576 (internal quotations omitted). "Normal meaning . . . excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Id.* at 576-77. While we may not be completely constrained by the original meaning of a text, it is certainly helpful to ascertain the meaning behind text – to understand the text, we often must embrace the predicate. The

majority completely abandons any examination or consideration of the original meaning of the text simply to fit a modern political narrative.

¶44.    While a review of Mississippi law does not reveal any general restrictions or prohibitions on concealed carry of weapons prior to the late 1800s, African Americans, both slave and free, were restricted from carrying or owning weapons. Slaves were generally banned from carrying weapons, absent permission from a justice of the peace on application of his master, and then the slave was only allowed to carry and use a weapon within the limits of his master's land. *See, e.g.*, Miss. Rev. Code ch. 73, § 10 (1823). The law further provided that "[n]o free negro or mulatto, shall be suffered to keep or carry any firelock of any kind, any military weapon, or any powder or lead, without first obtaining a license from the court . . . ." *Id.* at ch. 73, § 12. After the Civil War ended, Mississippi passed "Black Codes" in 1865, which continued the prohibition against black people owning a gun without a special license. Miss. Laws ch. 23, § 1 (1865); Jason Phillips, *Reconstruction in Mississippi, 1865-1876*, Mississippi History Now (May 2006), *available at* http://www.mshistorynow.mdah.ms.gov/articles/204/reconstruction-in-mississippi-1865-1876 (last visited June 6, 2018); Michael H. Hoffheimer, Kris Gilliland, & Lynn Murray, *Pre-1900 Mississippi Legal Authority*, 73 Miss. L.J. 195, 226 (2003). Retaining these prohibitions after the Civil War was so important to white Mississippians that Chief Justice Handy, in an unpublished opinion, declared the Civil Rights Bill unconstitutional in a freedman's challenge to his conviction for carrying firearms. *See Decision of Chief Justice Handy, Declaring the Civil Rights Bill Unconstitutional.*, published in *The New York Times*,

Oct. 26, 1866, p.2, col. 3. Because of resistance to black rights in Mississippi, Congressional Reconstruction began in 1867. Phillips, *supra*.

¶45.    The first Mississippi Constitution provided that "[e]very citizen has a right to bear arms in defence of himself and the state." Miss. Const. art. 1, § 23 (1817). The corresponding provision in the Mississippi Constitution of 1832 is nearly identical, providing that "[e]very citizen has a right to bear arms in defence of himself and of the state." Miss. Const. art. 1, § 23 (1832). The Mississippi Constitution of 1869, drafted in 1868 during Congressional Reconstruction,[17] altered the right to bear arms, providing that "*All persons shall have a right to keep and bear arms for their defense.*" Miss. Const. art. 1, § 15 (1869) (emphasis added). During the early years of Reconstruction, Freedmen communities were often well-armed, and able to defend their rights. David H. Schenk, *Freedmen with Firearms: White Terrorism and Black Disarmament During Reconstruction*, The Gettysburg College Journal of the Civil War Era: Vol. 4, Article 4 (2014). White Southern entities consequently began to systematically disarm African Americans. *Id.*; **McDonald v. City of Chicago**, 561 U.S. 742, 771-72, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010).

¶46.    Democrats regained political power in Mississippi in 1876, and "African Americans were effectively excluded from political life by extralegal means." Hoffheimer, et al., 73 Miss. L.J. 195, 227. Reconstruction ended, and by 1880, the Legislature had generally

_____

[17]The convention's ninety-seven delegates included seventeen African Americans. David Sansing, *Mississippi's Four Constitutions*, 56 Miss. L.J. 3, 8 (1986); Hoffheimer, et al., *supra*, at 227.

prohibited the concealed carry of weapons, absent some narrow exceptions. Miss. Rev. Code Ch. 77, § 2985 (1880).[18]

¶47.    One of the "main goals" of the Mississippi Constitution of 1890 "was to provide formal, legal means for excluding African Americans from voting and running for office." Hoffheimer, *et al.*, *supra*, at 229. The purpose of the 1890 Constitution to disadvantage African Americans is well-documented. David Sansing, *Mississippi's Four Constitutions*, 56 Miss. L.J. 3, 10 (1986); Neil R. McMillen, Dark Journey: Black Mississippians in the Age of Jim Crow 40-44 (1989); Miss. Const. art. 8, § 207 (segregating schools); Miss. Const. art. 12, § 243 (poll tax); Miss. Const. art. 12, § 244 (voter must be able to read and/or understand the Constitution); Miss. Const. art. 14, § 263 (forbidding interracial marriage); Miss. Const. art. 14, § 264 (must be a qualified elector and able to read and write to qualify as a juror). Section 12 of the 1890 Constitution changed the right to bear arms back from "all persons" to "citizens," and allowed the Legislature to regulate or forbid carrying concealed weapons. This alteration was one of several "craftily designed to obstruct or deny certain rights to African Americans . . . ." Westley F. Busbee, Jr., Mississippi: A History 178 (2d ed. 2015). Such measures regulating or prohibiting concealed carry could be selectively enforced. *Id.*; Clayton E. Cramer, *The Racist Roots of Gun Control*, 4-WTR Kan. J.L. & Pub. Pol'y 17, 20 (1995) (the Fourteenth Amendment "led to the adoption of restrictive

---

[18]The primary exception tied directly to the constitutional right was one related explicitly to *defense*. It was not a crime to carry a concealed weapon if one was "threatened with, or having good and sufficient reason to apprehend an attack." Miss. Rev. Code ch. 77, § 2985 (1880). Notably, Ward does not appear to be threatened or to apprehend attack at the courthouses at issue. The 1890 Constitution then solidified the Legislature's ability to restrict or prohibit the concealed carry of weapons.

firearms laws in the South that were equal in the letter of the law, but unequally enforced"). The original intent of Section 12, therefore, was for the Legislature to be able to *restrict or prohibit* the concealed carry of weapons. That the original intent of adding the provision regarding the Legislature to the right to bear arms was restriction of that right was noted in contemporaneous documents and has been recognized by Judge Coleman in a Fifth Circuit case. Governor Robert Lowry called attention to the problems surrounding the concealed carry of weapons and called for radical means to end the practice. Journal of the House of Representatives of the State of Mississippi, Governor's Message, pp. 15-41 (1890). He noted that "[l]aw abiding citizens, who make up and constitute well-regulated communities, don't carry concealed weapons." *Id.* at 36. He observed that a person concealing weapons "invites antagonisms and then avails himself of its unlawful use." *Id.* He urged that any carried deadly weapon should be "done openly and the carrier advertise his bravery, instead of concealing on his person, and in easy reach, the means of taking human life." *Id.* In more recent times, the Fifth Circuit noted that "[b]y 1890 the carrying of concealed deadly weapons had attained such gravity that statutes prohibiting such conduct received special constitutional sanction[.]" ***McLain v. Lafayette Cty. Bd. of Educ.***, 673 F.2d 106, 107 (5th Cir. 1982).

¶48.    Consequently, the Legislature criminalized concealed carry of weapons, with only narrow exceptions, for approximately one hundred years. Miss. Code Ann. § 1026 (1892); Miss. Code ch. 28, § 1103 (1906); Hemmingway's Miss. Code § 829 (1917); 1962 Miss. Laws ch. 310, § 1 (amending Section 2079 of the Code); John W. Winkle III, The

26

Mississippi State Constitution 36 (2d ed. 2014) (in 1990, the Legislature passed the so-called "gunslinger" laws allowing citizens to carry handguns in many locations). This Court found that criminal penalties for concealed carry were appropriate even when a person lacked criminal intent, and even when he carried the concealed weapon in his own home. *Strahan v. State*, 8 So. 844 (Miss. 1891); *Wilson v. State*, 33 So. 171 (Miss. 1903).

¶49. "[I]t is necessary to construe all the provisions of the Constitution together, and to deduce from them as a whole *the policy and purpose* of the constitutional convention." *St. Louis & S.F. Ry. Co. v. Benton Cty.*, 96 So. 689, 690 (Miss. 1923) (emphasis added). It is clear that the constitutional convention contemplated stringent restrictions and/or prohibitions on the concealed carry of weapons, and was constitutionally sanctioning those prohibitions already present in the statutes. Yet, according to the majority, this provision of the Constitution sanctions the Legislature's supreme authority over concealed weapons, even if said authority were to contravene other constitutional provisions. Our Constitution protects property rights. Miss. Const. art. 3, §§ 14, 17. A private citizen may prohibit weapons from his private property. According to the majority, Section 12 allows the Legislature to override property rights as it relates to concealed weapons, as it finds the Legislature supreme over concealed weapons and the concealed weapons provision of the Constitution supreme over the remainder of the Constitution. Yet, as discussed, the original intent of the provision allowing the Legislature to regulate or forbid concealed carry was to restrict and/or prohibit concealed carry of weapons. The majority inexplicably determines that this provisions delegated to the Legislative branch of our government the power to control security of the

27

entire courthouse. Such an interpretation finds no basis in either the plain language of the Constitution or the original meaning of the provision. This interpretation appears to fall in the way of a "secret" or "technical" meaning that the ordinary citizen in 1890 would not have understood. We turn to analyze the separation of powers against this backdrop.

### B. Separation of Powers

¶50. Our Constitution provides that the powers of the state government "shall be divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another." Miss. Const. art. 1, § 1. It further provides that "[n]o person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others." Miss. Const. art. 1, § 2. This language remains, in substantive part, essentially unchanged from the language in the Mississippi Constitution of 1817. Judge Leslie Southwick, *Separation of Powers at the State Level: Interpretations and Challenges in Mississippi*, 72 Miss. L.J. 927, 938-39 (2003). The separation of powers language in the Mississippi Constitution is more stringent than any found in the federal Constitution. *See generally id.* The stringency came from a concern that the concentration of power in one branch would lead to despotism. *Id.* Indeed, Thomas Jefferson had concerns that legislative control over other branches' budgets gave the legislative branch too much power. *Id.* Consequently, one important issue at the 1817 constitutional convention was "to ensure the independence of the judiciary." Winbourne

28

Magruder Drake, *The Framing of Mississippi's First Constitution*, 29 J. of Miss. Hist. 301, 318 (1967).

¶51.    Under the Mississippi Constitution, the administration of justice is *solely* a judicial function and obligation.  That function and that obligation both extend beyond the four walls of the courtroom.  The Legislature's passage of Section 97-37-7(2), which allows for the carrying of concealed weapons in courthouses except in courtrooms while court is in session, seeks to limit the judicial branch in the performance of its judicial function; thus, it is a clear violation of Article 1, Sections 1 and 2, which mandate the separation of powers between the executive, legislative, and judicial branches of government.

¶52.    Article 6, Section 155 of the Mississippi Constitution requires judges of this State to take the following oath:

> I . . . solemnly swear (or affirm) that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent upon me . . . according to the best of my ability and understanding, agreeably to the Constitution of the United States and the Constitution and laws of the State of Mississippi.  So help me God.

Miss. Const. art. 6, § 155.  The Legislature's passage of Section 97-37-7(2) seeks to limit the constitutional obligation imposed upon judges by this oath, and is thus a violation of Article 1, Sections 1 and 2, which mandate the separation of powers between the executive, legislative, and judicial branches of government.  As applied to the judiciary, this statute is unconstitutional.

*Inherent Powers*

29

¶53. Additionally, the orders are within the inherent power of the court to propound. "The judicial power of the State shall be vested in a Supreme Court and such other courts as are provided for in this Constitution." Miss. Const. art. 6, § 144. "This same Constitutional requirement for our courts to exist obviously carries with it the duty on the part of the Legislative branch to provide sufficient funds and facilities for them to operate independently and effectively." *Hosford v. State*, 525 So. 2d 789, 797 (Miss. 1988). Otherwise, the constitutional mandate for three separate and co-equal branches would be emasculated "by reducing courts to supplicants only of the Legislature." *Id.* The judicial power provided for in the Mississippi Constitution "includes the power to make rules of practice and procedure, not inconsistent with the Constitution, for the efficient disposition of judicial business." *Id.* (internal quotations omitted). Moreover, the judiciary has the constitutional obligation to fairly "administer justice." Miss. Const. art. 6, § 155; *Newell v. State*, 308 So. 2d 71, 77-78 (Miss. 1975).

¶54. The judicial power provided for in the Constitution clearly reaches issues necessary for the efficient disposition of judicial business, so long as judicial control of those issues is not inconsistent with the Constitution. Moreover, inherent in the constitutional duty to "administer justice" is the ability, when necessary, to control the location at which justice is administered.[19] Real or perceived danger or the potential for violence clearly impedes the

---

[19]"[B]eyond mere access [to courthouses], people require a safe and secure environment free from fear or intimidation. Judges, employees, and members of the general public need to feel safe if they are to conduct themselves impartially and decorously." Don Hardenbergh, *Protecting America's Courthouses*, 44 No. 3 Judges' J. 14 (Summer 2005).

"The courthouse is a place where moods, personalities, and lives come together at a time of disagreement. It is possible for a person to lose control of his behavior at any type

30

administration of justice. This Court has implicitly recognized that the judiciary may control security for an entire courthouse, and thus recognized that the judicial authority over security may extend beyond the four walls of the courtroom. *See **McCune v. State***, 989 So. 2d 310, 317 n.16 (Miss. 2008) (noting that, for a specific trial, the court allegedly used extra security precautions, such as "law enforcement in and around the courthouse, metal detectors, and limited entryways" and also noting that "untoward conduct in courthouses caused by unwelcome societal changes has prompted increased security in many courthouses."); *see also **Hosford***, 525 So. 2d 789 (noisy conditions prevented court from operating independently and effectively, and legislative branch may be subject to appropriate court orders when the court's integrity is at issue). Indeed,

> [n]o court created by the Constitution is required to accept conditions which prevent it operating independently and effectively. Such court also has the duty under our governmental system to protect its own integrity. It likewise has the inherent authority as part of a separate and co-equal branch to make such orders to insure that independence and integrity.

***Hosford***, 525 So. 2d at 798; Miss. Const. art. 1, §1.[20]

---

of court proceeding. . . . Criminal and domestic relations cases are the source of a great number of acts of violence. But other types of litigation – including but not limited to will contests, landlord-tenant disputes, and even cases involving animals and pets – also can bring out the worst behavior in people." Richard W. Carter, *Keeping a Secure Courthouse*, 76 Judicature 314 (April-May 1993).

"Presiding judges are responsible to see that trials are conducted in an orderly manner. Certainly, order is nonexistent if violence is present or threatened in the courthouse and courtroom. Courts have used their inherent powers to secure needed facilities, personnel, equipment, and services." *Id.*

[20]The Legislature failed to provide the funds to the judiciary that would be necessary to adequately secure courtrooms without securing the courthouse. In his amicus brief, Chancellor Persons lays out the cost to taxpayers to adequately secure the courtrooms of Harrison County, when the ability to control courthouse security is removed:

31

¶55. "[T]he courtroom and courthouse premises are subject to the control of the court."

***Sheppard v. Maxwell***, 384 U.S. 333, 358, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). Federal

law criminalizes the possession of weapons in federal facilities, including federal court

facilities. 18 U.S.C. § 930(a), (e)(1). Federal court facilities are specifically defined as

meaning certain rooms and offices used by courts and court officers. 18 U.S.C. § 930(g)(3).

Yet, federal courts have the ability to control the *entire building* in which they are situated.

When it passed the law, Congress recognized the pre-existing power[21] of the courts to control

court security, stating that "[n]othing in this section limits the power of a court of the United

States to punish for contempt or to promulgate rules or orders regulating, restricting, or

prohibiting the possession of weapons within *any building* housing such court or any of its

proceedings, or upon *any grounds* appurtenant to such building." 18 U.S.C. § 930(f)

---

Of vital importance to each county of this state is the additional cost of providing security at each door of each courtroom in each courthouse in each county in the event the Writ of Prohibition is granted. In these tight budget times, a real question is presented as to the ability of the counties of this state to provide adequate security at the courtroom door for each of their courtrooms. Sheriff Peterson addresses the anticipated cost to Harrison County of providing security to each of the twelve (12) courtrooms in his jurisdiction in paragraph 7 of his Declaration. The annual cost of providing the required security at each of Harrison County's twelve courtroom doors in terms of the additional staffing requirements is $528,000 (12 x $44,000), in addition to a one time cost to provide metal detection devices for the twelve courtrooms of $90,000 (12 x $7,500). To the extent the sheriff is required to employ additional deputies to provide security at each courtroom door, these individuals must complete the certification requirements mandated for law enforcement officers. ***Lewis***, 158 So. 3d at 1123-24. Sheriff Peterson states that the cost of training each deputy is approximately $6,500, which is reimbursed to the sheriff's department by the State of Mississippi.

[21]Tellingly, the statute does not purport to grant the courts this power; it rather recognizes that courts already have this power.

(emphases added). Congress clearly enacted this law *in furtherance* of the inherent powers of the courts, not in restraint of it.

¶56. The Attorney General argues that "trial judges do not have general authority to unilaterally control courthouse security outside of the courtroom itself in the ordinary course of business" because the Legislature has delegated control of courthouse security to the executive branch. It is clear that the sheriff has the general duty to secure his county's courthouses. Miss. Code Ann. § 19-25-69 (Rev. 2012); *Lewis v. Hinds Cty. Circuit Court*, 158 So. 3d 1117 (Miss. 2015). Indeed, the sheriff is the "executive officer of the circuit and chancery court of his county." Miss. Code Ann. § 19-25-35 (Rev. 2012). However, this duty and authority must be harmonized with and be subject to the inherent power of the court to control the administration of justice.

¶57. In *Lewis*, the Hinds County Circuit Court had issued court orders that "addressed the hours, uniform, discipline, and duties of bailiffs." *Lewis*, 158 So. 3d at 1119-20. The justification for the orders was that, because the court can statutorily have a bailiff removed, "judicial involvement with the sheriff does not violate the constitution." *Id.* at 1125. At no point did the circuit court maintain that its orders were necessary for the administration of justice or that any of the sheriff's actions regarding bailiffs impaired the ability of the court to operate independently and effectively. And indeed, this Court acknowledged that "courts have inherent power over their courtrooms, including the authority to define the attire of bailiffs and others in attendance." *Id.* Rather, the court, without any allegations that the sheriff was disrupting the administration of justice, encroached on the sheriff's duty to

33

maintain "the general safety of the courthouse and specifically protect[] it from violence, attacks, and injuries." *Id.* at 1123-24. The sheriff certainly has a statutory duty to protect the court, a duty upon which a court generally should not encroach.[22] However, the courts have a *constitutional*, i.e., higher than statutory, duty to administer justice and operate independently and efficiently. To the extent a security issue impacts a court's constitutional duty to administer justice, it is within its inherent power to address.[23]

---

[22]The majority alleges that courthouse security beyond the courtroom falls solely within the province of the executive branch without addressing how Mississippi Code Section 97-37-7(2) directly conflicts with such a duty. Maj. Op. ¶¶ 12-13. If a sheriff determines that all concealed weapons should be banned from a courthouse, has the Legislature encroached on the sheriff's duty? It would appear so.

[23]Other jurisdictions have also acknowledged a court's inherent authority over courthouse security in various circumstances. *Epps v. Commonwealth*, 626 S.E.2d 912, 916 (Va. App. 2006)("[I]t would be folly to claim the circuit court judge has the power to ensure courtroom, but not courthouse, security. If the judge is impotent to supervise who enters the courthouse, the ability to ensure the security of the courtroom is diminished."); *State v. Wadsworth*, 991 P.2d 80, 82 (Wash. 2000)("This Court has recognized the inherent power and obligation of the judiciary to control all its necessary functions to promote the effective administration of justice. We have stated that the inherent powers of the courts are neither derived from nor dependent upon express constitutional authority, but the courts are empowered to do all that is reasonably necessary for the efficient administration of justice. . . . Supreme Courts in other jurisdictions have also relied upon the inherent powers doctrine as the basis for resolving issues concerning courthouse security and the general administration of court facilities. Under the inherent powers of the courts, the judiciary has authority to administer justice and to ensure the safety of court personnel, litigants and the public."); *Petition of Mone*, 719 A.2d 626, 628-29 (N.H. 1998) ("An integral part of any court's duty to administer justice and fairly adjudicate disputes is to ensure that all parties have the opportunity to advance their cause in an atmosphere of safety, decorum, and fairness. . . . Thus, because the providers of court security play an integral role in the most fundamental function of any court, the adjudicatory function, it is an improper encroachment on the judiciary's power for the legislature to mandate the provider of court security."(internal citations omitted)); *Bd. of Cty. Comm'rs of Weld Cty. v. Nineteenth Judicial Dist.*, 895 P.2d 545, 546-47 (Colo. 1995) ("Without security the public's confidence in the integrity of the judicial system is threatened. The proper administration of justice requires that courts operate in a safe and secure environment. When society views

34

¶58. The Second Circuit has likewise held that control of courthouse security by the courts is "essential."[24] *United States v. Smith*, 426 F.3d 567, 576 (2d Cir. 2005), *cert. denied* 546 U.S. 1204 (2006). The court acknowledged the Marshals Service and Secretary of the Department of Homeland Security are statutorily charged with protecting federal courts, but

---

the security of the court system with skepticism, the authority of the judicial branch is diminished. A weak judicial branch prevents a proper functioning of the tripartite scheme of government. The Chief Judge properly ordered security so the courts may continue to fulfill their constitutional mandate and administer justice in an orderly and dignified atmosphere."); *see also* **Halverson v. Hardcastle**, 163 P.3d 428 (Nev. 2007) ("[C]ourts have the inherent authority to make certain that their courtrooms are secure. By necessity, this latter exercise of inherent power extends to securing courthouse security in general."); **State v. Spaulding**, 507 S.E.2d 376 (W. Va. 1998) (court had "inherent power to provide adequate security, which is essential to the safe and orderly administration of justice"); **State v. Shelton**, 243 S.E.2d 455 (S.C. 1978) (trial judge has inherent authority to take measures reasonably necessary to secure orderly proceedings and preserve the security of those present; "[t]he exercise of this authority by the trial judge is not inhibited by the guarantees of the Fourth Amendment. Therefore, the Fourth Amendment protection against unreasonable searches and seizures is inapplicable to a courtroom in the exercise of the trial judge's authority and duty to preserve security and order."); **In the Matter of Spike**, 415 N.Y.S.2d 762 (Cty. Ct., Yates County, N.Y. 1979) (inherent powers of the court to perform efficiently its judicial functions includes the court's responsibility to assure that security services are provided); **In re the Matter of the Judicial Space in the Bradford Cty. Courthouse**, 378 So. 2d 1247 (Fla. Dist. Ct. App. 1979) (regarding allocation of space, "a court of general jurisdiction has inherent power to acquire and control facilities which are essential to secure and safeguard free and untrammeled exercise of its functions"); *see also* **Smith v. Washington Cty.**, 43 P.3d 1171 (Ct. App. Or. 2002) (courthouse security is within a court's statutory administrative authority, noting that "the effective functioning of courts of the state is served by preventing people from entering courthouse facilities with hazardous substances and weapons.").

[24]This issue is one of first impression in Mississippi, and that it is appropriate to look to our sister states for guidance. *See, e.g.*, **Enterprise Leasing Co. South Cent. Inc. v. Bardin**, 8 So. 3d 866 (Miss. 2009) (Randolph, J., for the Court); **Lemon Drop Props., LLC v. Pass Marianne, LLC**, 73 So. 3d 1073 (Miss. 2011) (Randolph, J., for the Court); **Moffett v. State**, 49 So. 3d 1073 (Miss. 2010) (Randolph, J., for the Court).

noted the Supreme Court's statement that the courtroom and courthouse premises are subject to the court's control. *Id.* It found that

> Control by the courts is essential, because the judiciary is uniquely attuned to the delicate balance between defendants' Sixth Amendment rights to public trial, the public and press's First Amendment rights to courtroom access, and the overarching security considerations that are unique to the federal facilities containing courtrooms. . . . The judiciary is uniquely competent to strike the proper balance.

*Id.* The Eleventh Circuit has likewise held that "[a] judge's authority to maintain control of his courtroom extends to the court building." *Stevens v. Osuna*, 877 F.3d 1293, 1307 (11th Cir. 2017). It noted that "[j]udges have an *obligation* to maintain control over the courthouse and over the conduct of persons in the courthouse[.]" *Id.* at 1305 (emphasis added). One district court also noted the constitutional implications that would be caused by weapons in courthouses, in upholding Section 930 against a Second Amendment challenge. *United States v. Giraitis*, 127 F. Supp. 3d 1, 2-3 (D.R.I. 2015). It stated that "[a] federal court facility is a governmental building where the public has a right to attend and observe courtroom proceedings and into which individuals may be *compelled* to appear as litigants, witnesses, jurors, etc." *Id.* at 3 (emphasis added). It acknowledged that "[s]uch courthouse activity has constitutional underpinnings. For instance, the Sixth Amendment guarantees the right to a 'public trial' . . . and the Seventh Amendment preserves the 'right of trial by jury.'" *Id.* at 3, n.3. The court found it "*undisputable* that the members of the public coming to the courthouse and those who work in the courthouse are *entitled* to a safe and secure environment . . . ." *Id.* at 3 (emphases added). Indeed, in criminal cases, the accused has the right to be confronted by the witnesses against him, to have compulsory process to obtaining

36

favorable witnesses, and to a public trial by jury. Miss. Const. art. 3, § 26; U.S. Const. amend. VI. The courts are required to be open, and the public has access to the courts. Miss. Const. art. 3, §§ 24, 25. Crime victims "have the right to be treated with fairness, dignity and respect throughout the criminal justice process[.]" Miss. Const. art. 3, § 26A. In civil or criminal trials, "[t]he right of trial by jury shall remain inviolate[.]" Miss. Const. art. 3, § 31; *see also* U.S. Const. amend. VII. The judiciary, and access thereto, implicates numerous constitutional rights. The safety of those *compelled* to be at the courthouse is necessary for the fair administration of justice; keeping safe and free from threat those people necessary to the judicial process, such as parties, criminal defendants, witnesses, and jurors, is crucial for the administration of justice, the integrity of the judicial system, and the preservation of the constitutional rights implicated at the courthouse. The majority subjugates all of these *constitutional* rights and provisions to the phrase "the Legislature may regulate or forbid carrying concealed weapons," instead of harmonizing them.

¶59.    One Utah order, in finding that the legislative and executive powers to protect the judicial process may not go so far as to define the *essential nature* of the judicial environment, eloquently wrote that

> No single characteristic of the judiciary is more defining of its nature nor of greater consequence to its purpose than its reliance on the power of reason and law rather than the power of the sword. The very essence of the judiciary is the antithesis of "might makes right." It represents one of man's most noble and complete aspirations at civilization. The gladiators in the legal arena are armed only with books and the power of reason and logic . . . . The right of the judiciary to maintain an arms-free environment not only relates to the protection of judge, jury, court personnel, counsel, litigants, and witnesses, but to the maintenance of an environment where even the silent influence of physical weaponry is eliminated.

Sixth District of Utah Order, quoted in Judge K.L. McIff, *Weapon-Free Courthouses and the Gun Locker Dilemma*, 16-JUL Utah B.J. 10 (June/July 2003). While a court may not *criminalize* bringing a weapon into a courthouse, as making the law is certainly within the province of the Legislature, the lower court in this case did not attempt to criminalize carrying a weapon into the courthouse. A determination that a court cannot fairly administer justice and protect constitutional rights when members of the public[25] may carry weapons into the courthouse is a determination within the judiciary's inherent power to make.

¶60. In this case, the chancellors of the Fourteenth District noted that many of the proceedings in their courtrooms are of a highly inflammatory nature and that the majority of confrontations in their district have occurred outside the four walls of the courtroom itself.[26]

---

[25]The majority appears to cite the wisdom of the Legislature to allow only certain enhanced concealed carry permit holders to carry weapons into courthouses. Maj. Op. ¶14. First, the constitutionality of a provision is not dependent on whether this Court deems it "wise." Under the majority's view of legislative power, the Legislature has the absolute power to authorize felons, members of organized gangs, or members of terrorist organizations to carry concealed weapons into courthouses. Second, if membership in an organized gang or terrorist organization is unknown, such persons may be able to obtain an enhanced concealed carry permit. Interestingly enough, the Mississippi Legislature in its wisdom bans all weapons from the Capitol unless permission is granted by a majority of one of the chambers. *See* Mississippi Legislature Joint Rules of the Senate and the House Joint Convention, Rule 37.

[26]Rule 3.08 of the Uniform Chancery Court Rules acknowledges the chilling effect weapons have on the fair administration of justice, requiring even law enforcement personnel remove firearms when they take the witness stand. UCCR 3.08. In a study done in Wisconsin, a commission noted that, where domestic violence is involved, "[e]ven only visual contact can have a chilling effect on the victim." Dianne Molvig, *Violence and the Judicial System: Stemming the Tide of Violence in our Courthouses*, 70-JUL Wis. Law. 10 (1997). Imagine the effect on the administration of justice in heated custody cases if one party or witness knew that the relatives of the opposing party could be sitting in the hallway outside the courtroom with a weapon. It does not stretch the imagination to determine that such knowledge could severely impact the fair administration of justice.

They made findings regarding the structure and layout of the courthouses in their district, and the impossibility of adequately securing the courtrooms and judicial chambers[27] without securing the courthouse due to multiple entrances, the proximity of the bench and witness boxes to multiple courtroom doors, and other such issues.[28] They determined that, because

[27]Where would the majority have legislative power end? Is there any line the Legislature could cross regarding concealed carry that the majority believes would impede the court's inherent power and obligation to fairly administer justice? What if the Legislature authorized criminal defendants to carry concealed weapons into the courthouse or the courtroom during their trials? Or abusive spouses during restraining order proceedings? Indeed, it may well have, as abusive spouses without convictions may be enhanced concealed carry permitees. According to the majority, the only reason that courts may prohibit weapons in a courtroom is because the Legislature magnanimously grants courts the permission to do so. Indeed, some members of the Legislature have expressed a desire to eliminate *all* gun-free zones. *See* Jeff Amy, *No Guns in Stadiums? No Guns for Mississippi's Teachers*, U.S. News and World Report (March 22, 2018), *available at* https://www.usnews.com/news/best-states/mississippi/articles/2018-03-22/house-kills-bil l-that-would-have-let-schools-arm-teachers (last visited June 6, 2018). The majority would also appear to force individual judges, including the Justices of the Supreme Court, to allow enhanced concealed carry permit holders to carry weapons into their private chambers, notwithstanding the fact that gun violence against the judiciary is such a concern that our windows consist of bullet-proof glass. The majority allows the Legislature to authorize the concealed carry of weapons into any location whatsoever that the Legislature so determined appropriate, without regard to any other constitutional provision, duty, or right, since the majority argues that the regulation of concealed weapons is an ***absolute and supreme*** legislative prerogative. The majority leaves even court*room* security up to the whims of the Legislature.

[28]The order only applies to the courthouse facility; it does not apply to the courthouse grounds. My opinion on this issue is therefore limited to the chancellors' authority to issue this order regarding courthouse security within the courthouse building. In the 2011 Order, the chancellors prohibited concealed carry "within 200 feet of any door to any courtroom which said courtrooms shall be extended cotextensive with any entrance door to any of the following Courthouses . . . ." Ward argued that the "200 feet" language extended the concealed carry ban to the grounds, and even to private property. The 2013 Order, which appears to have replaced the 2011 Order, eliminates the "200 feet" language and provides that concealed carry is prohibited "in any courtroom . . . and which said Courtroom doors shall be extended coextensively with any exterior door of any of the seven Courthouses . . . ." Further, in their original Response to the Writ of Prohibition, the chancellors clarified

of these factors, allowing people to carry firearms into the courthouse imposed a safety

hazard that impairs the court's duty and ability to administer justice and operate

independently and efficiently.[29]  Based on the findings by the chancellors in this case that

that

> . . . The figure of a radius of 200 feet was also included in the order and could be classified as surplusage.  It was unclear as to how far from the courtroom door was every exterior door in the seven (7) courthouses, so out of an abundance of caution and for clarity, the reference to any exterior door was included to make the area to be restricted clear and beyond question.
> Mr. Ward is in error by stating that the order extends the courtrooms past the exterior doors by 200 feet into businesses.  A simple reading of the order clearly reveals no such extension past any exterior door.  This was never the intention . . . .

While the language of the 2011 Order is somewhat confusing, I take the chancellors at their word; moreover, the 2013 Order by its plain language clarifies that the Order only applies to the courthouse building, not to courthouse grounds or private property.

[29]The right to keep and bear arms is not unfettered, nor does the Mississippi Constitution grant a right to keep and bear arms for any reason whatsoever.  Ward argues simply that he was "unable to carry his firearm concealed or otherwise in the" courthouse. It is clear that Ward did not need to carry a weapon into the courthouse in aid of the civil power when legally summoned, as no civil power summoned him.  It is also clear that Ward did not need to carry a weapon into the courthouse to defend his home.  Ward does not even attempt to articulate why he needed to carry a weapon into the courthouse to defend his person or property.  Thus, Ward does not even provide facts for this Court to determine whether any alleged right has been infringed.  Moreover, he does not articulate any prejudice or injustice he suffered by not being allowed to carry a weapon in the courthouse. Constitutional rights are often restricted. For example, when it comes to interpreting the Fourth Amendment's explicit  statement that the right to be free against unreasonable searches and seizures "shall not be violated," the majority's interpretation is puzzlingly divergent.  This Court has held that constitutional rights, including Fourth Amendment rights, need not be strictly enforced where the person whose rights are violated does not articulate sufficient prejudice or injustice suffered, nor must they be strictly enforced when compelling social interests indicate that they should not be. *See Delker v. State*, 50 So. 3d 300 (Miss. 2010) (Randolph, J., for the Court) (regarding enforcing the exclusionary rule against a Fourth Amendment violation due to a violation of jurisdictional boundaries, finding that any deterrent effect "is significantly outweighed by the 'substantial social costs'

allowing weapons in the courthouses of their district presents a security problem that jeopardizes the independent and effective administration of justice, I would find that the order at issue is permissible as an exercise of the judiciary's inherent power to administer justice.[30]

¶61.    I would find that the order is an appropriate exercise of inherent judicial authority and that Section 97-37-7(2), as applied to the courts, violates the separation of powers. I disagree with the majority's holding that the phrase "the Legislature may regulate or forbid carrying concealed weapons" reigns supreme over every other provision in our Constitution. I would deny Ward's petition for writ of prohibition, and accordingly dissent.

      **KITCHENS, P.J., JOINS THIS OPINION.  WALLER, C.J., AND BEAM, J., JOIN THIS OPINION IN PART.**

---

and 'harm to the justice system' exacted by exclusion . . . . It takes neither a judge nor a lawyer to recognize the compelling social interest in protecting innocent citizens from drunk drivers and the offense to 'basic concepts of the criminal justice system' by 'letting guilty and possibly dangerous defendants go free.'"); **Hall v. State**, 201 So. 3d 424 (Miss. 2016) (Randolph, P.J., for the Court).

[30]This Court has held that where the proclamations of the Legislature that touch on the judiciary "coincide with fair and efficient administration of justice," the Court will cooperate with them.  **Newell**, 308 So. 2d at 78.  But when those proclamations impair justice, thus impinging on the Court's constitutional mandate to fairly administer justice, "it remains our duty to correct it."  **Id.**  It may be that certain courts find, based on the layout of the courthouse and nature of cases, that carrying of concealed weapons by enhanced concealed carry permit holders does not impinge on the administration of justice, and that is within their province to determine.  But where a court determines that it cannot carry out its constitutional duty to fairly administer justice in the presence of concealed weapons in its courthouse, it likewise is within its province to determine.